FREHLING ENTERPRISES, INC., d.b.a. Oggetti, Plaintiff-Appellant, Counter-defendant,

v.

INTERNATIONAL SELECT GROUP, INC., d.b.a. Bell' Oggetti International Ltd., Defendant-Appellee, Counter-claimant.

No. 98-4153.

United States Court of Appeals,

Eleventh Circuit.

Oct. 18, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 96-1486-CIV-GRAHAM), Donald L. Graham, Judge.

Before ANDERSON, Chief Judge, MARCUS, Circuit Judge, and MILLS[*], Senior District Judge.

ANDERSON, Chief Judge:

## I. INTRODUCTION

This is a servicemark infringement case. Plaintiff Frehling Enterprises, Inc. ("Frehling") claims that its registered "OGGETTI" mark is being infringed upon by Defendant International Select Group, Inc.'s ("ISG") "BELL' OGGETTI" mark. Frehling sells high-end decorative accessories and furniture for the home under its "OGGETTI" mark, and ISG sells ready-to-assemble furniture designed to house electronic equipment in the home under its "BELL' OGGETTI" mark. The district court held a bench trial and ruled in favor of ISG, finding that there was no likelihood of consumer confusion with respect to the two marks. Frehling appeals, and argues that the district court's finding as to the lack of a likelihood of confusion between the two marks was clearly erroneous.

## II. STATEMENT OF FACTS

"OGGETTI" means "objects" in Italian. Robert Frehling, president of Frehling Enterprises, began using the mark in connection with his decorative furniture business in 1975. He adopted the name because many of Frehling's products were manufactured in Italy. He filed an application to register the mark with the

---

[*]Honorable Richard H. Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

Patent & Trademark Office in 1985. The application was accepted and the mark was accordingly registered as a service mark, thus receiving federal protection in 1985. Frehling's "OGGETTI" line is sold at department stores, like Macy's and Bloomingdale's, and is sold through various catalogs as well. In addition, Frehling owns showrooms located in New York, Atlanta, and High Point, North Carolina, and leases many more, in Chicago, Los Angeles, and other major cities. The district court described "OGGETTI" furniture as high-end furniture sold in finer stores and noted that it was targeted at affluent consumers.

"BELL' OGGETTI" means "beautiful objects" in Italian. ISG began using this mark in 1989 in connection with its line of audio-visual furniture. In May 1990, ISG filed an application to register its mark with the Patent & Trademark Office, but was denied because of the perceived confusion that might arise in connection with the earlier-registered "OGGETTI" mark. Upon ISG's further application, however, the Office ruled in favor of ISG and permitted registration of the trademark.[1] ISG sells ready-to-assemble equipment-containing furniture like stereo and television cabinets. ISG sells its furniture to mass market retail outlets, such as Circuit City and HiFi Buys, and also sells its products, as does Frehling, through catalogs.

---

[1]The district court and ISG both note the fact that Frehling's mark is a service mark and ISG's mark is a trademark. Servicemarks identify services, whereas trademarks identify goods. However, this distinction has little legal significance in the instant case. The infringement analysis is the same under both standards and courts thus treat the two terms as interchangeable in adjudicating infringement claims. *See e.g., Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1009 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Murphy v. Provident Mutual Life Ins., Co.,* 923 F.2d 923, 927 (2d Cir.), *cert. denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991); *Nutri/System, Inc. v. Con-Stan Indus., Inc.,* 809 F.2d 601, 604 (9th Cir.1987); *see also Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981). In this case, the "OGGETTI" mark, though registered as a service mark, is used to identify "OGGETTI" furniture—the service that is identified by the mark is the sale of that furniture to consumers and retailers. Thus, in effect, the mark operates like a combined service mark and trademark-the distribution and sale (of the furniture) are the services protected, while the furniture itself is the good protected. In any event, the district court did not hold that a service mark cannot be protected if the objectionable term used by the Defendant is a trademark, not a service mark, and ISG does not so argue to this court. The standard under the Lanham Act is the likelihood of confusion, and while the distinction between a trademark and a service mark may be relevant for registration purposes, it is not particularly relevant for the purposes of the likelihood of confusion analysis. Here, the goods (the furniture) are so intimately bound up with the services (the sale of the those goods) that distinguishing them is fruitless, and affects neither the analysis nor the disposition of the instant case.

In 1994, ISG procured the toll-free telephone number, "1-800-OGGETTI." This number was included on the enclosed instruction sheet accompanying the purchased product and detailing how to assemble to the furniture. "BELL' OGGETTI" and "1-800-OGGETTI" appeared on the instruction sheet.

In 1995, Frehling president Robert Frehling saw an advertisement for BELL' OGGETTI in a *House Beautiful* magazine. He called ISG complaining of what he felt was service mark infringement. Shortly thereafter, he sent a demand letter asking ISG to cease using the mark and to cancel its registration. ISG refused, but did stop promoting the "1-800-OGGETTI" toll free phone number. It retained the phone number, but only printed and distributed the numeric toll free number. Frehling then filed suit under the Trademark (Lanham) Act, 15 U.S.C. §§ 1114 (infringement) and 1125(a) (dilution), and various state-law claims.[2] After a two day bench trial, the district court ruled in favor of ISG, finding that there was no likelihood of confusion so as to violate the Lanham Act, nor any cognizable claim under state law.

### III. DISCUSSION

Under the Lanham Act, 15 U.S.C. § 1114(1), a defendant is liable for infringement, if, without consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive." Thus, to prevail, a plaintiff must demonstrate (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion. *See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 122 F.3d 1379, 1382 (11th Cir.1997); *Dieter v. B & H Indus. of S.W. Fla., Inc.,* 880 F.2d 322, 326 (11th Cir.1989), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). The priority of Frehling's mark is not in dispute, and thus the issue for this Court is whether the district court clearly erred in finding that there was no likelihood that consumers would confuse the two marks.

---

[2]These state-law claims were for deceptive and unfair trade practices under Fla. Stat. ch. 501, false advertising under Fla. Stat. § 817.41, unfair competition under Florida common law, dilution under Fla. Stat. § 495.151, and dilution under Florida common law.

This Court considers the following seven factors in assessing whether or not a likelihood of consumer confusion exists:

1. Type of mark

2. Similarity of mark

3. Similarity of the products the marks represent

4. Similarity of the parties' retail outlets (trade channels) and customers

5. Similarity of advertising media

6. Defendant's intent

7. Actual confusion

*See Lone Star,* 122 F.3d at 1382. Of these, the type of mark and the evidence of actual confusion are the most important. *See Dieter,* 880 F.2d at 326. The findings as to each factor, and as to the ultimate conclusion regarding whether or not a likelihood of confusion existed, are subject to the clearly erroneous standard of review. *See id.* at 325.

1.      *Type of Mark*

Classifying the type of mark Plaintiff has determines whether it is strong or weak. *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 973 (11th Cir.1983). The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives. *See id.* at 973. There are four categories of marks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *See Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). The categories are based on the relationship between the name and the service or good it describes. *See John H. Harland Co.,* 711 F.2d at 974. Generic marks are the weakest and not entitled to protection—they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor). *See Freedom Savings,* 757 F.2d at 1182-83 n. 5. Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where

4

glasses are sold). *See id.* "Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive." *Dieter,* 880 F.2d at 327 (internal quotation marks omitted). For instance, "penguin" would be suggestive of refrigerators. *See Freedom Savings,* 757 F.2d at 1182-83 n. 5. An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services). *See id.* Arbitrary marks are the strongest of the four categories. *See id.*

Also important in gauging the strength of a mark is the degree to which third parties make use of the mark. *See John H. Harland Co.,* 711 F.2d at 974-75; *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 316 (5th Cir. July 20, 1981). The less that third parties use the mark, the stronger it is, and the more protection it deserves. *See John H. Harland Co.,* 711 F.2d at 975.

Finally, if a mark is "incontestable," that is, if it has been registered for five years with the Patent & Trademark Office, its holder has filed the affidavit required by 15 U.S.C. § 1065(3) with the Patent & Trademark Office, and the Patent & Trademark Office has accordingly declared the mark "incontestable," then the mark's incontestability serves to enhance its strength. *See Wilhelm Pudenz, GmbH v. Littlefuse, Inc.,* 177 F.3d 1204, 1208 (11th Cir.1999); *Dieter,* 880 F.2d at 328-29.

In the instant case, the district court found that Frehling's "OGGETTI" mark was suggestive.[3] The court found that the mark was adopted to create an Italian connotation (because the products were manufactured in Italy) and that the mark suggests or describes a significant number of products that Frehling produces-that is, fine, decorative "objects d'art." The court held that, as a suggestive mark, Frehling's mark

---

[3]Under the "doctrine of foreign equivalents," a word from another language that is commonly used in that language as the generic name of a product cannot be imported into the United States and thereby transformed into a valid trademark. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 12:41, at 12-83 (4th ed.1996). Thus, in the strength-of-mark analysis, foreign words are translated into English before being tested for descriptiveness or genericness. *See id.* As noted above, "OGGETTI" is the Italian word for the English word "objects." At oral argument, ISG's counsel disclaimed any argument that the doctrine of foreign equivalents made Frehling's mark generic, and conceded that the district court did not clearly err in characterizing Frehling's "OGGETTI" mark as suggestive. Consequently, we have no need to address the possible impact of the foreign equivalents doctrine in the instant case.

5

is entitled to protection without any showing of secondary meaning, but failed to quantify the mark as a strong one. We are persuaded that the mark is indeed a strong one, and thus we conclude that the district court clearly erred in not attributing the proper strength to the mark that it was due under the case law.

In particular, the district court did not address the lack of third-party use of Frehling's mark in gauging the mark's strength. The case law is clear that such lack of third-party use should be considered in assessing the strength of a mark. *See, e.g., John H. Harland Co.,* 711 F.2d at 973-75 (collecting cases standing for the proposition that extent of third-party use is an important factor in determining the distinctiveness and thus the strength of the mark); *Sun Banks,* 651 F.2d at 313 (same); 2 McCarthy, *supra,* § 11.88 (same). Where there is a lack of third-party use, the mark's strength is enhanced, as it is more distinctive, and therefore more easily recognized by consumers. *See Sun Banks,* 651 F.2d at 313. The record indicates that the "OGGETTI" mark was not used by third parties, thereby contributing to its distinctiveness and enhancing its strength. Thus, by failing to recognize the lack of third-party use of Frehling's mark and by not inserting that fact into its calculation of the strength of Frehling's mark, the district court erred.

Moreover, the district court failed to consider the fact that Frehling's mark is incontestable and therefore constitutes a "relatively strong mark." *See Wilhelm Pudenz,* 177 F.3d at 1208; *Dieter,* 880 F.2d at 329. Like the lack of third-party use, this is a factor that should have contributed to the strength of the mark, but which the district court failed to mention in its discussion of the mark's type. In sum, a proper assessment of the "OGGETTI" mark's strength reveals that the first factor in the analysis—the type of mark—clearly favors Frehling.

2.      *Similarity of the Marks*

Here, the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used. *See John H. Harland Co.,* 711 F.2d at 975-76. In the instant case, the district court found that although the marks both include the Italian term "OGGETTI," they are not similar because ISG adduced evidence showing that Frehling often used the words

6

"Tavola Collection" in connection with its "OGGETTI" mark. According to the court, these extra words—"Tavola Collection"render the marks dissimilar and significantly reduce the likelihood that consumers would confuse "OGGETTI" with "BELL' OGGETTI." The court concluded that this factor favored ISG.

We are persuaded, however, that the marks are very similar, and that this factor strongly favors Frehling; the district court clearly erred in concluding otherwise. ISG's "BELL' OGGETTI" mark is extremely similar to Frehling's "OGGETTI" mark in that the dominant focus in both marks is the Italian term "OGGETTI." Both parties stylize their marks in like fashion, using all capital letters. "BELL' OGGETTI" entirely encompasses "OGGETTI" and merely adds a descriptive adjective "BELL' " meaning "beautiful" to the dominant portion of the mark—the noun "OGGETTI," meaning objects. Thus, the overall impression the marks create is one of striking similarity—they are strikingly similar in sight, sound, and meaning. Moreover, the manner in which they are used is similar in that both are used in advertising to denote home furnishings. In sum, then, the instant comparison reveals the sort of high degree of similarity between marks that portends a likelihood of consumer confusion. Given this palpable similarity, we hold that the "similarity of marks" factor strongly favors Frehling.

In finding the marks dissimilar, the district court's considerable reliance on the fact that Frehling's mark often appeared as "Tavola Collection by OGGETTI" is misplaced. The underlying purpose in considering the similarity of marks as an indicator of likelihood of confusion is that the closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents. The probability of this potential confusion is the touchstone. In the instant case, Frehling's use of the phrase "Tavola Collection by OGGETTI" clearly attributes the source of the product to "OGGETTI" in that the words "by OGGETTI" are used in conjunction with the words "Tavola Collection." The words "Tavola Collection" suggest that they represent but a single product line or signature collection of "OGGETTI." The use of these words, contrary to the upshot of the district court's holding, does not undermine the attribution

7

of the source of the products to "OGGETTI"; a mark may be surrounded by additional words of lesser importance and not have its strength diluted. *See Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 154-55 (6th Cir.1973). Notwithstanding the phrase "Tavola Collection," "OGGETTI" is still the dominant portion of the mark, and clearly designates the source of the product. Thus, given the striking similarity between Frehling's "OGGETTI" mark and ISG's "BELL' OGGETTI" mark, it seems highly probable that a reasonable consumer could likely be confused as to the source of the products that each mark represents. The inclusion of the words "Tavola Collection" does little to reduce the danger of that potential confusion in light of the overwhelming similarity of the marks, and thus the district clearly erred in concluding otherwise and in finding that this factor favored ISG.

3.      *Similarity of the Goods*

This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties. *See E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir.1985). In the instant case, the district court found that the products were not similar, holding that they were not similar in function or design. The court focused on the differences in composition: "BELL' OGGETTI" furniture was typically made of metal and tempered glass and came in ready-to-assemble form and was meant to house electronic equipment, whereas "OGGETTI" furniture was made of more "exotic" material like wood, marble, stone, or shell veneer, was marketed and designed to appear unique, and was meant mainly for decoration.

The district court noted that it was unpersuaded by Frehling's evidence which attempted to show that "OGGETTI" offered custom-made armoires to house television sets, thus serving the same function as "BELL' OGGETTI" furniture, housing electronic components, because the "OGGETTI" armoires were made of wood, not black metal, and further were not ready-to-assemble, and were more expensive than their

8

"BELL' OGGETTI" counterparts. The district court thus concluded that the products were different in function, design, style, and price. It accordingly noted that this factor favored the Defendant.

Although we hesitate to attach a clearly erroneous label to the district court's finding that the parties' products were dissimilar, we are persuaded that the district court improperly weighed this evidence in the overall balance of the likelihood of confusion analysis. In other words, we find that the outcome as to this factor is far closer than the district court indicated and thus does not clearly favor ISG.

In *E. Remy Martin,* our Court reversed the lower court's finding that wine and cognac or brandy were dissimilar "to the drinking world." 756 F.2d at 1530. For our Court, the test was not whether the goods could be distinguished, as they could be by any drinker, but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods. *See id.* Thus, in *E. Remy Martin,* it was not unreasonable to conclude that a maker of wine could also produce brandy. *See id.*

Viewing the instant case in this light, a reasonable consumer could possibly attribute the products here to the same source—both products are home furnishings. While the compositional differences matter, they are not dispositive; we focus, rather, on the reasonable belief of the average consumer as to what the likely source of the goods was. In this case, it is not unreasonable to fathom that the goods emanate from the same source. Both products are furniture pieces, designed for the home, and both have the capability to house electronic equipment. In addition, both products are marketed as having an Italian design and thus a consumer could, on this basis alone, given that both marks connote furniture, attribute the products to one source given the shared Italian theme.

Therefore, although the products are somewhat dissimilar in composition, function, and design, they are similar in that they are both home furnishings sold under a very similar Italian label, and hence it seems possible that a consumer could attribute both products to a single source. While this possibility is perhaps not strong enough to suggest a likelihood of consumer confusion, neither is it so remote as to raise the opposite inference—that a reasonable consumer would likely not be confused. Thus, to the extent that the

9

district court found that this factor favored ISG significantly, we find that the attribution of such weight to this factor in ISG's favor was clearly erroneous.

4.        *Similarity of the Parties' Retail Outlets (Trade Channels) and Customers*

"Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 262 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). This factor takes into consideration where, how, and to whom the parties' products are sold. *See* 4 McCarthy, *supra,* § 24:51, at 24-71. Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion, *see Jaguar Cars Ltd. v. Skandrani,* 771 F.Supp. 1178, 1184 (S.D.Fla.1991), though evidence that the products are sold in the same stores is certainly strong. The parties' outlets and customer bases need not be identical, but some degree of overlap should be present. In the instant case, the district court found that "OGGETTI" was directed at more affluent consumers and thus was found in "higher-end" department stores like Macy's and Bloomingdale's. On the other hand, the court concluded that "BELL'OGGETTI" was aimed at less affluent consumers who shopped in mass market retail outlets, like Circuit City and Sears. Given this disparity, the district court concluded that this factor favored ISG.

As with the similarity of products factor, we find that the district court's conclusion with respect to the instant factor, while not clearly erroneous, does not militate heavily in favor of ISG, if at all. We are troubled by the district court's methodology of dividing the world up into distinct segments of "affluent" and "less affluent" for the purpose of determining the balance of the instant factor. Common sense suggests such a categorical distinction is tenuous. *See* 4 McCarthy, *supra,* § 24:52, at 24-74-75 ("[I]t may be difficult to draw a line between those consumers who shop at 'class' retailers and those who shop at 'mass' retailers because of those consumers who 'cross-shop' and frequent both types of retailers."). In other words, affluent people shop at Sears and less affluent people shop at Macy's. Hence, there would seem to be overlap in customer base even though the retail outlets where the parties' products are sold are not exactly the same.

10

Furthermore, "OGGETTI" presented evidence that it sells to consumers through catalogs, as does BELL' OGGETTI, and that both companies are expanding their operations to the Internet. In addition, both companies sell their wares to and through interior designers. Lastly, the similarity of advertising media, discussed *infra,* suggests that the parties indeed target the same types of customers, evidenced by their advertisements in similar types of magazines, like *Architectural Digest* and *House Beautiful,* for instance. With these facts in hand, we conclude that the district court clearly erred by weighing this factor too heavily in favor of ISG; rather, we see the balance on this factor as much closer than the district court found it to be.

5.      *Similarity of Advertising Media*

This factor looks to each party's method of advertising. *See John H. Harland Co.,* 711 F.2d at 976. In the instant case, both parties advertise in print media, including magazines, newspapers, catalogs, and direct mailings. The district court found, however, that because ISG advertises primarily through electronics publications, like *Stereo Review,* and Frehling does not advertise in those publications, that the parties do not advertise through the same media. Again, this finding is somewhat suspect, and certainly does not militate strongly in favor of ISG.

Evidence was presented below demonstrating that in addition to advertising in electronics publications, ISG advertised in home magazines, like *Design Times* and *House Beautiful.* Indeed, at oral argument, ISG conceded that for two years, one-quarter of its advertising was in *House Beautiful.* Frehling adduced evidence that "OGGETTI" advertises in the same genre of home magazines as "BELL' OGGETTI," including *Interior Design* and *Architectural Digest.* ISG argued, and the district court accepted, the premise that the parties have never advertised in the same publication and therefore the advertising media used by the parties were not similar.

This argument does not fairly represent the proper legal standard, however. Identity of periodicals is not required; the standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result. *See Safeway Stores,*

11

*Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1166 (11th Cir.1982). With respect to the magazines listed above, i.e., *Architectural Digest* and *House Beautiful,* such a significant overlap seemingly exists. Thus, many of the same consumers would be exposed to both magazines, and by derivation, both marks. Though the parties do not advertise in exactly the same periodicals, they both advertise in periodicals, and very similar ones at that. Consequently, the advertising factor seems to favor Frehling, and the district court's conclusion that the instant factor favors ISG strikes us as incorrect.

6.      *Defendant's Intent*

If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity. *See John H. Harland Co.,* 711 F.2d at 977. In the instant case, the district court found that there was no conscious intent to capitalize on Frehling's business reputation on the part of the ISG, but that ISG was "intentionally blind" in deciding to adopt the "BELL' OGGETTI" mark, and accordingly noted that this factor favored Frehling.

On appeal, Frehling points out that this intentional blindness was manifested by ISG's failure to conduct a trademark search before attempting to register its "BELL' OGGETTI" mark in 1990. In addition, Frehling notes that after ISG's request to register the "BELL' OGGETTI" mark was refused by the Patent & Trademark Office because of the potential likelihood that it may be confused with Frehling's earlier-registered "OGGETTI" mark, ISG continued to pursue the use of its "BELL' OGGETTI" mark, without making any attempt to contact Frehling or to explore the potential likelihood of confusion between the two marks. In other words, ISG clearly had notice as to the strong similarity of the marks and hence was aware that they may be confused and yet continued to use the "BELL' OGGETTI" mark. Moreover, given this knowledge, Frehling asserts that ISG's later adoption of the 1-800-OGGETTI toll free number is particularly indicative of improper intent. Indeed, the 1-800 number constitutes a direct replication of Frehling's "OGGETTI" mark. Furthermore, ISG continued to use the 1-800 number despite Frehling's repeated objections and contrary to

12

the advice of ISG's own counsel.  Given the totality of this evidence, we agree with the district court that ISG's behavior displays an improper intent through intentional blindness and, given the demonstrated prevalence of this improper intent, we accordingly conclude that this factor weighs substantially in Frehling's favor.

7.    *Actual confusion*

It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion. *See John H. Harland Co.,* 711 F.2d at 978.  However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case.  *See Amstar,* 615 F.2d at 263.  The district found that Frehling had not made a showing of actual confusion.

At trial, the Plaintiff did offer some evidence of actual confusion.[4]  The principal evidence of actual confusion adduced at trial was Robert Frehling's testimony that a professional "BELL' OGGETTI" buyer, along with his wife, visited an "OGGETTI" showroom in High Point, North Carolina.  Apparently, the man mistakenly believed that he was in a "BELL' OGGETTI" store.  He could not understand why the showroom sign said only "OGGETTI" and not "BELL' OGGETTI."  The district court admitted this testimony, but assigned little weight to it, concluding that it was self-serving and vague, seemingly because the confused buyer's name could not be recalled.

On appeal, Frehling characterizes the evidence as much more probative.  In support of its argument that this incident embodies compelling evidence of actual confusion, Frehling points out that it is not the number of people actually confused by the marks that is important, but rather the type of person confused.

---

[4]On appeal, Frehling invites this Court to take judicial notice of two additional incidents that it claims demonstrate actual confusion.  We decline to take judicial notice of these additional incidents for several reasons.  *See Shahar v. Bowers,* 120 F.3d 211, 212 (11th Cir.1997)(en banc), *cert. denied,* --- U.S. ----, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998).  First, it is not our practice to consider on appeal facts that were not before the trial court.  Second, these types of facts are not of the type that may be judicially noticed anyway;  for example, they are not matters of authentic public record and are not otherwise "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). Consequently, Frehling's Motion to Take Judicial Notion of Certain Facts on Appeal is denied, and therefore we do not consider the additional instances of alleged confusion in our analysis of whether a showing of actual confusion was made in the instant case.

This notion is supported by the case law. *See Safeway Stores,* 675 F.2d at 1167 (noting that "the people confused are precisely those whose confusion is most significant: a supplier, presumably relatively familiar with an enterprise since he is actually providing it with goods, and a customer, without whom the business would not exist").

In the instant case, the type of person confused was telling: a professional buyer for "BELL' OGGETTI," visiting a company showroom. As noted above, the district court did not mention this point, but instead seemed to discount the entire incident as constituting vague and, hence, unpersuasive evidence. The court, however, did not expressly make a finding that Frehling's testimony was not credible, and the fact that Frehling could not remember the buyer's name does not seem significant enough that it would strip the testimony of all its credibility and relative weight. Thus, in light of the reasoning in *Safeway Stores*—that the confusion of someone very familiar with the enterprise (like the professional buyer in the instant case) is relevant evidence of actual confusion—we conclude that the above incident was at least sufficient to raise an inference of actual confusion, but we conclude that the outcome as to this factor is not sufficiently dispositive so as to favor either side in an appreciable fashion.[5]

Evaluating the overall balance of the seven above factors, we hold that Frehling demonstrated a likelihood that its senior "OGGETTI" mark would be confused with ISG's junior "BELL' OGGETTI" mark. We hold that the district court's conclusion to the contrary, that there was no likelihood of confusion, was

---

[5]The only other evidence of actual confusion was excluded by the district court as double hearsay. It involved an incident in which a telephone operator was confused with respect to the 1-800-OGGETTI number. Frehling challenges the exclusion on appeal, but because we find the evidence would have been entitled to very little relative weight even if admitted, we decline to address whether or not it was properly excluded. *See* 3 McCarthy, *supra,* § 23:13, at 23-41 (noting that evidence demonstrating the confusion of telephone operators is often not particularly probative of actual confusion and is often due more to carelessness than to actual confusion).

We also note that ISG argued at trial that Frehling had not proffered any survey evidence demonstrating actual confusion and therefore a presumption against such confusion should apply. This Circuit, however, has moved away from relying on survey evidence. *See Safeway Stores,* 675 F.2d at 1167 n. 10. Thus, the failure to adduce such evidence is not damaging to the Plaintiff's case. The district court correctly held that the lack of survey evidence was not dispositive.

clearly erroneous. In so holding, we conclude that factors one, strength of the mark, two, similarity of the marks, and six, defendant's intent, weigh in Frehling's favor, with particular emphasis on how similar the sight, sound, and usage of the marks were. We conclude that factors three, similarity of goods, and four, similarity of trade channels and customers, did not weigh heavily in favor of ISG; to the extent that the district weighed these factors strongly in ISG's favor so as to preclude a finding of a likelihood of confusion, we hold that the attribution of such significant weight to those factors was clearly erroneous. With respect to factor five, similarity of advertising media, we conclude that the district court applied an improper legal standard, and that, applying the correct legal standard, it is clear, at the very least, this factor does not favor ISG. With respect to factor seven, actual confusion, we find that this factor favored neither side. In sum, we are persuaded that Frehling demonstrated a likelihood that a reasonable consumer would be confused by the two marks and would likely be confused as to the source of the goods that each mark represents,[6] and that the district court's contrary conclusion was clearly erroneous.

## IV. CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

[6]We construe Frehling's briefs on appeal to have abandoned Count VII (state common-law dilution). However, with respect to Frehling's other state-law claims, because the district court erred in finding no likelihood of confusion, and that erroneous ruling likely informed the district court's ruling on the similar state-law claims, the district court should reconsider those state-law claims on remand.