97 F.Supp.2d 1154 (2000)
GENERAL CONFERENCE CORPORATION OF SEVENTH-DAY ADVENTISTS and General Conference of Seventh-Day Adventists, an Unincorporated Association, Plaintiffs,
v.
Raphael (Rafael) PEREZ, d/b/a Eternal Gospel SDA Church, Eternal Gospel Church of Laymen Seventh Day Adventists, Iglesia Adventista Del Septimo Dia Del Evangelio Eterno, Eternal Gospel Independent Church of Seventh Day Adventists, Eternal Gospel Church of Seventh Day Adventists,
and
Raphael Perez, Julio Ochoa, Andres Roman, Wilfredo Pinela, Antonio Prado, directors of unincorporated association currently known as the Eternal Gospel Church of Seventh Day Adventists,
and
Ministerio Adventista Del Septimo Dia Del Evangelio Eterno, Inc. (Eternal Gospel of the Seventh Day Adventist Ministry, Inc.), a dissolved Florida corporation,
and
Eternal Gospel Church of Laymen Seventh Day Adventists, a Washington state Corporation Sole, Defendants.
No. 98-2940CIV.
United States District Court, S.D. Florida.
April 27, 2000.
*1155 *1156 Jeffrey Tew, Miami, FL, for plaintiffs.
Robert Pershes, Coral Springs, FL, for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
JAMES LAWRENCE KING, District Judge.
1. The Court has jurisdiction of this matter pursuant to 15 U.S.C. §§ 1121 and 1128 and pursuant to 38 U.S.C. §§ 1331, 1337, 1338, 2201 and 2202.
2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).
3. Plaintiff, GENERAL CONFERENCE CORPORATION OF SEVENTH-DAY ADVENTISTS is a corporation of the District of Columbia, having its principal place of business at 12501 Old Columbia Pike, Silver Spring, Maryland. The Plaintiff GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS is an unincorporated association and is the Seventh-day Adventist Church. The Plaintiff GENERAL CONFERENCE CORPORATION OF SEVENTH-DAY ADVENTISTS is the corporate entity established by the Seventh-day Adventist Church to hold title to the spiritual church's assets and to serve the spiritual church in carrying out its purposes. The Plaintiffs will be referred hereafter as "Plaintiff."
4. The Defendant Raphael Perez is the managing agent and minister of THE ETERNAL GOSPEL CHURCH OF SEVENTH DAY ADVENTISTS (hereafter "Defendant's Church"), an unincorporated association, and is a director of the Defendant MINISTERIO ADVENTISTA DEL SEPTIMO DIA DEL EVANGELIO ETERNO[1] and the sole shareholder of ETERNAL GOSPEL CHURCH OF LAYMEN SEVENTH DAY ADVENTISTS, a Washington "sole" corporation. The other Defendants named in the amended complaint have not been served and Plaintiff is proceeding without their being served. The Defendants will be hereafter referred to as "Defendant."
5. The Lanham Act, 15 U.S.C. § 1051 et seq. provides that no person shall, without consent of the registrant, use in commerce any trademark if "such use is likely to cause confusion, or to cause mistake or to deceive." Id. at § 1114(1)(a).
6. Terms which may be registered as trademarks fall into four categories of strength (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary. American Television v. American Communications, 810 F.2d 1546, 1548 (11th Cir.1987); University of Georgia Athletic Ass'n v. Laite, 756 F.2d 1535, 1540 (11th Cir.1985). "Generic" terms are those which name "the genus or class of which an individual article or service is but a member." "Descriptive" terms "identify a characteristic or quality of an article of service." "Suggestive" terms suggest characteristics of the goods and services and "require an effort of the imagination by the consumer in order to be understood as descriptive." "Fanciful" or "arbitrary" terms are words or phrases that bear no direct relationship to the product. Generic terms represent the weaker end of the spectrum and arbitrary terms represent the stronger. Vision Ctr. v. Opticks, 596 F.2d 111, 115 (5th Cir.1979), cert. denied, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).
7. Generic terms may never be registered as trademarks under the Lanham Act. 15 U.S.C. § 1052(e). Descriptive terms may not be registered as trademarks *1157 under the Lanham Act, unless the holder shows that the mark has acquired "secondary meaning." 15 U.S.C § 1052(e)(1), (f); Citibank, N.A. v. Citibanc Group, Inc., 724 F.2d 1540, 1549 (11th Cir.1984); Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 10 (2d Cir.1976). Proof of secondary meaning in a trademark requires a showing that the mark has become distinctive of the trademark holder's product or services.
8. Five years after registering a mark, the holder may file the affidavit required by § 1065 and have its marked declared "incontestable." 15 U.S.C. § 1065(3). Once a mark has become "incontestable," its validity is presumed, subject to certain enumerated defenses set out in 15 U.S.C. § 1115(b).[2]Park `N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Dieter v. B & H Industries of Southwest Florida, Inc., 880 F.2d 322, 327 (11th Cir.1989).
9. The Lanham Act, 15 U.S.C.A. § 1114(1) provides the Plaintiff in a trademark infringement action has made a prima facie case if the Plaintiff shows first that its mark is valid and second that the Defendant's use of Plaintiff's mark is likely to cause confusion. Determination of likelihood of confusion requires analysis of seven factors (1) type of mark, (2) similarity of marks, (3) similarity of the products and/or services the marks represent, (4) similarity of the parties' retail outlets and customers, (5) the similarity of advertising media used, (6) Defendant's intent and (7) actual confusion. Dieter v. B & H Indus. of Southwest Florida, Inc., 880 F.2d 322, 326 (11th Cir.1989), cert. denied, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990).
10. In order to establish a likelihood of confusion all factors do not have to be resolved in favor of the Plaintiff. Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1167 (11th Cir.1982). Applying the seven factors to the evidence in this case, the Court finds Plaintiff's and Defendant's marks are (1) trademarks utilized on identical religious "products" and service marks used in conjunction with identical religious "services," (2) the marks are patently similar due to the Defendant's utilization of Plaintiff's entire SEVENTH-DAY ADVENTIST mark, (3) the Church related products, Church services and Church titles are vastly similar, (4) the church attending people ("customers") of both parties are believers in Seventh-day Adventism, (5) the advertising is similar through publications, church signs and radio broadcasts, (6) Defendant's intent is apparent from Defendant's prior knowledge of Plaintiff's SEVENTH-DAY ADVENTIST name, and (7) actual confusion, though unnecessary to prove, is evidenced by newspaper articles reflecting confusion in the minds of those attending church services of both entities ("customers").
11. The underlying purpose in considering similarity of marks (factor (2)) as an indicator of likelihood of confusion is that the closer the marks are, the more likely reasonable consumers will mistake the source of the product (or service) that each mark represents. The probability of this potential confusion is the touchstone. Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F.3d 1330 (11th Cir.1999). In the instant case, the words Eternal Gospel Church suggest they represent but a single church of Plaintiff's many Seventh-day Adventist Churches and designate Plaintiff as the source of products and services. The inclusion of Eternal Gospel Church in the title Eternal Gospel Church of Seventh Day Adventists *1158 does not reduce the danger of potential confusion in light of the overwhelming similarity of the marks.
12. To establish secondary meaning, the owner of the mark must show that, in the minds of the public, the primary significance of a term is to identify the source of the product rather than the product itself. Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606.
13. The issue of whether a term has acquired secondary meaning is a question of fact. In determining whether a term has acquired secondary meaning entitling it to trademark protection, the following factors must be considered: (1) length and manner of its use; (2) nature and extent of advertising and promotion; (3) efforts made by the Plaintiff to promote conscious connections in the public's mind between the name and the Plaintiff's product or business; and (4) extent to which the public actually identifies the name with the Plaintiff's product or venture. Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir.1984).
14. The mark "SEVENTH-DAY ADVENTIST" was registered (Reg. No. 1,177,185) as a trademark and a service mark by the Plaintiff with the United States Patent and Trademark Office on May 7, 1980 and Plaintiff has filed an affidavit of use of the mark as required by 15 U.S.C. § 1058(a) and said registration is now valid. The validity of the registered mark and of the registration, and the Plaintiff's ownership and exclusive right to use said mark in commerce are incontestable under 15 U.S.C. § 1065 and 15 U.S.C. § 1115(b) as Plaintiff has filed the required affidavit with the Commission of Patents and Trademarks. Dieter v. B & H Industries of Southwest Florida, Inc., 880 F.2d 322, 327 (11th Cir.1989). The Plaintiff's registration covers religious books, magazines, pamphlets, newsletters, brochures, encyclopedias, dictionaries, commentaries, fliers, bulletins, yearbooks, booklets and bibles; for establishment and administration of employee health care and benefit programs and medical insurance programs; for educational instruction services in academics at grade school, high school and college level; for film production and distribution services; for health care services, namely hospital, pharmaceutical, nursing home and medical laboratory services; and for conducting religious observances and missionary services, church services, namely rendering ministerial and religious counseling services.
15. On July 2, 1998, the Plaintiff registered (T98000000764) the mark "SEVENTH-DAY ADVENTIST" in Florida under Chapter 495, F.S. § 495.181, F.S. requires that "... in construing (the Florida statute) due consideration and great weight be given to the interpretations of the federal courts relating to comparable provisions of the Trademark Act of 1946, as amended (15 U.S.C. § 1051 et seq.)."
16. Defendant Raphael Perez was a member of a Seventh-day Adventist Church of Plaintiff in West Palm Beach, Florida. He, along with approximately 40 to 50 other members left Plaintiff's Seventh-day Adventist Church in West Palm Beach, Florida in 1991 to form his own church (Defendant's Church.) During 1991 and 1992 Perez attempted to gain admission for Defendant's Church into Plaintiff's Southeastern Conference of the Seventh-day Adventist Church ("SEC"). During 1991 and 1992 when Defendant's Church was attempting to join the SEC, the Defendant Perez operated the Defendant Church using the Plaintiff's name "SEVENTH-DAY ADVENTIST" and Plaintiff's acronym "SDA" in connection with radio broadcasts in Florida. In 1992 officials of the SEC told Perez that he would not be able to gain admission into the SEC unless he ceased his radio broadcasts criticizing the Catholic church. Perez refused to agree to this condition of admission and was denied admission to Plaintiff's SEC.
*1159 17. Perez then attempted to join the Florida Conference (another Conference of the Plaintiff General Conference). He and his church were again denied admission due to his refusal to stop the anti-Catholic radio broadcasts.
18. The Defendant's Church never gained admission into the Southeastern Conference or any other conference of the Seventh-day Adventist Church. Defendant Perez did not gain employment, ordination or licensing as a minister of the Southeastern Conference or any other conference of the Seventh-day Adventist Church.
19. Prior to the time Defendant began using "SEVENTH-DAY ADVENTIST" and Plaintiff's acronym "SDA" he knew of Plaintiff's use of "SEVENTH-DAY ADVENTIST" and Plaintiff's acronym "SDA."
20. Since 1992 Perez has continued to operate the Defendant's Church in West Palm Beach, Florida. His church sign currently says "ETERNAL GOSPEL CHURCH OF SEVENTH DAY ADVENTISTS." Defendant's Church sign is confusingly similar to the signs of Plaintiff Seventh-day Adventist churches. Perez has continued his radio broadcasts identifying his Church as a Seventh-day Adventist church. Beginning in 1994 Perez has run newspaper advertisements throughout the United States under various names incorporating the name "SEVENTH-DAY ADVENTIST" and Plaintiff's acronym "SDA," to wit: ETERNAL GOSPEL CHURCH OF SEVENTH DAY ADVENTISTS, ETERNAL GOSPEL SDA CHURCH, ETERNAL GOSPEL CHURCH OF LAYMEN SEVENTH DAY ADVENTIST, IGLESIA ADVENTISTA DEL SEPTIMO DIA DEL EVANGELIO ETERNO and ETERNAL GOSPEL INDEPENDENT CHURCH OF SEVENTH DAY ADVENTISTS. The Defendant has used Plaintiff's mark in connection with churches, church services, religious services and observances, church signs, newspaper advertisements, newspapers, fliers, billboards, and audio tape recordings and on radio broadcasts. The Defendant's Church is listed in the section of "Seventh-day Adventist Churches" in the West Palm Beach telephone directory.
21. Defendant's uses of Plaintiff's mark are likely to and have resulted in confusion and damage to the Plaintiff's reputation.
22. In the present case Plaintiff's trade name, trademark and service mark SEVENTH-DAY ADVENTIST is at least suggestive and at a minimum is descriptive (not generic). The words "seventh-day" alone define Saturday as the seventh day of the week, but alone do not suggest keeping the seventh day holy within the total doctrines and tenants of Plaintiff herein. Similarly, the word "Adventist" alone defines the coming of Christ, but alone does not suggest the specificity of Christ's coming within the total doctrines and tenants of the Seventh-day Adventist Church. Finally, in combination the words "seventh-day" and "Adventist" suggest the two concepts (Sabbatarism and Adventism) noted herein, but though suggesting these two concepts, none describe other requisite statements of belief which distinguish the Seventh-day Adventist Church, through the use of the suggestive name SEVENTH-DAY ADVENTIST, from other "Sabbatarians" and "Adventists." The mark SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA are clearly suggestive (but at a minimum are eminently descriptive (not generic)). Persons who are members of the relevant public recognize the mark SEVENTH-DAY ADVENTIST and Plaintiff's legally equivalent acronym SDA as an indication of source or origin, namely, a name identifying the services and products of the Seventh-day Adventist Church, and the marks should be protected without proof of secondary meaning.
23. However, even if the Plaintiff's registered mark is "merely descriptive" since it is "incontestable" under 15 *1160 U.S.C. § 1065(3) and has gained secondary meaning it is valid and enforceable.
24. Plaintiff's trade name, trademark and service mark SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA have acquired secondary meaning through the continuous usage thereof from 1860 forward (well prior to Defendant's first use in 1992) and, as such, the names SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA must be protected fully as if the names were strong at inception. Evidence of the distinctiveness of Plaintiff's marks begins with the adoption of SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA over 139 years ago, and the continuous and uninterrupted use of SEVENTY-DAY ADVENTIST and Plaintiff's acronym SDA to date as the name of Plaintiff and its products and services. The mark SEVENTH-DAY ADVENTIST is used in Plaintiff's denominational, corporate and trade name (Seventh-day Adventist Church) and in all of its Union Conference names, its local conferences, and virtually all of its Seventh-day Adventist Churches throughout the United States. Plaintiff's mark has become distinctive as a result of the large number of people who have been ministered and served through its churches and publications, its schools, colleges and universities, its hospitals and its national outreach under the mark SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA. Through members, workers, ministers and pastors and associated health and education programs, media centers, publishing houses and the publications thereof, the mark SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA have become famous and synonymous with the good will and quality of the Seventh-day Adventist Church. Plaintiff has expended considerable effort and expense over the last 139 years in promoting its mark SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA and the products and services associated therewith, and consequently the mark is entitled to broad protection.
25. In evaluating a claim of secondary meaning, consumer surveys are recognized as the most direct and persuasive evidence of secondary meaning. Investacorp, Inc. v. Arabian Investment Banking Corporation, 722 F.Supp. 719 (S.D.Fla.1989); Schmidt v. Honeysweet Hams, Inc., 656 F.Supp. 92 (N.D.Ga.1986).
26. The Roper Survey conducted by Plaintiff's expert witness Harry O'Neill in the summer of 1999, established Plaintiff's use of its mark has resulted in the general public in the United States identifying the words "SEVENTH-DAY ADVENTIST" with the Plaintiff Church. Further, the Roper Survey showed that the Plaintiff's mark has achieved secondary meaning in the minds of the general public throughout the United States as identifying the Plaintiff Church. Two prior surveys conducted by the Gallup Organization in 1970 and 1986 also support strong identification in the minds of the public between the mark SEVENTH-DAY ADVENTIST and the Plaintiff Church.
27. The Plaintiff's acronym "SDA" has obtained secondary meaning with the Plaintiff and the use thereof by the Defendant will cause confusion. Accordingly Plaintiff is entitled to enforce its common law rights to the acronym "SDA." Automated Productions Inc. v. FMB Maschinenbaugesellschaft mbH & Co., 34 U.S.P.Q.2d 1505 (N.D.Ill.1994).
28. The Defendant also use the Spanish name "MINISTERIO ADVENTISTA DEL SEPTIMO DIA DEL EVANGELIO ETERNO" which contains an exact translation of the English trademark "SEVENTH-DAY ADVENTIST." Under the doctrine of foreign equivalents, the marks are confusingly similar. Popular Bank of Florida v. Banco Popular de Puerto Rico, 9 F.Supp.2d 1347, 1358 (S.D.Fla.1998).
29. Florida's "anti-dilution" statute[3], *1161 provides for injunctive relief if it appears that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark notwithstanding the absence of competition between the parties or of confusion as to the source of goods and services. Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1168 (11th Cir.1982); Freedom Savings and Loan Association v. Way, 757 F.2d 1176, 1186 (11 Cir.1985); Abner's Beef House Corp. v. Abner's Int'l, Inc., 227 So.2d 865, 866 (Fla.1969).
30. Defendant's use of the Plaintiff's mark has created both a likelihood of confusion and actual confusion and injury to Plaintiff's business reputation and dilution of the distinctive quality of Plaintiff's SEVENTH-DAY ADVENTIST name.
31. The Defendant has raised the defenses that (a) Plaintiff is estopped on a theory of "issue preclusion" by virtue of the prior judgment in General Conference Corporation of Seventh-day Adventists v. Seventh-Day Adventist Kinship International, Incorporated, U.S.D.C. CD Calif., Case No. 87-8113 (hereafter referred to as the "Kinship case"); (b) Plaintiff is estopped by virtue of actions taken by the Southeastern Conference of the Seventh-day Adventist Church which permitted Defendant to use the mark; (c) the Plaintiff's mark is "generic" and not entitled to trademark protection; (d) Defendant' use of the Plaintiff's mark is a "fair use" of the mark; (e) that the use of the mark by the Defendant' is protected under the First and Fourteenth Amendments to the United States Constitution.
32. In the Kinship case, the Plaintiff sued to enjoin Seventh-day Adventist Kinship International, Incorporated (hereafter "SDA Kinship") from using the name "SEVENTH-DAY ADVENTIST." SDA Kinship was a group that provided support for gays and lesbians. The Court in Kinship denied the Plaintiff's claim for trademark protection based upon a finding that Defendant SDA Kinship did not use the name "SEVENTH-DAY ADVENTIST" as the name of a church.
33. The Kinship opinion finding, that the term "Seventh-day Adventist" is generic when used by a gay support group, is distinguishable from the case at bar where Defendants use "SEVENTH-DAY ADVENTIST" in their church name, church publications, radio broadcasts and newspaper advertising. The Kinship court opinion supports an analysis that "SEVENTH-DAY ADVENTIST" is not generic when used as a church name and in connection with religious services and religious publications.
34. Had the Court in Kinship found SEVENTH-DAY ADVENTIST to be generic for the classes of goods (publications) and services (religious observances, i.e. churches) protected by Plaintiff's registration, the Court necessarily would have canceled Plaintiff's Reg. No. 1,177,185 under 15 U.S.C. § 1119 which reads:
"In any action involving a registered mark, the court may  order the cancellation of registrations, in whole or in part  and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the Court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby."
35. The Kinship Court did not order the cancellation of Plaintiff's Reg. No. *1162 1,177,185, as is evidenced by the certified copy of record (Plaintiff's Trial Exhibit No. 154), which duly notes on the face thereof that the registration is valid. The Kinship decision and the absence of an order of cancellation by the Kinship court do not support Defendant's allegation of genericness.
36. The contemporary historical evidence does not show that the term "SEVENTH-DAY ADVENTIST" was generic, i.e. established as the name of either the religious faith or its followers prior to 1860. The Review and Herald documents and other historical records of the period show the persons and congregations that formed the "Seventh-day Adventist Church" in 1860 were not known before 1860 by the name "Seventh-day Adventist." Prior to 1860 no church was named "Seventh-day Adventist." Plaintiff's expert, Dr. Reid and Defendant's expert, Dr. Colin Standish, both testified that the persons who shared a belief in the second coming of Christ (the Advent) and that the Biblical Sabbath should be observed (the seventh-day) had no common name but were referred to by many names. The term "Seventh-day Adventist" is only found in three documents prior to 1860. These de minimis references do not prove that prior to 1860 either the faith or followers were commonly called or known as Seventh-day Adventists.
37. The Court finds that "SEVENTH-DAY ADVENTIST" has not become generic. The Plaintiff's surveys, as well as its use of the name, convince the Court that most of the public identifies "SEVENTH-DAY ADVENTIST" as the name of the Plaintiff Church and not a religion. Whether "SEVENTH-DAY ADVENTIST" is generic when used to refer to a religion, does not answer the question of whether it is generic when used as a church name by the Defendant Church. See Christian Science Bd. v. Evans, 520 A.2d at 1360 (Garibaldi, J. dissenting). The Court finds that when used as a church name "SEVENTH-DAY ADVENTIST" is not generic.
38. The Defendant began use of the Plaintiff's name while the Defendant was attempting to become admitted as a member church of the Plaintiff. The defenses of laches and acquiescence should not arise from the use while Defendant was seeking admission to the Plaintiff's Southeastern Conference. See National Board of Young Women's Christian Association v. Young Women's Christian Association of Charleston South Carolina, 335 F.Supp. 615 (D.S.C. 1971) and cases cited therein, where the Court found that a religious organization is entitled to protection against the use of its name by those who secede from the organization. The YWCA court found that use of the name while the Defendant was affiliated with Plaintiff accrued no rights to use the name to the seceding Defendant group after secession.
39. The laches defense requires proof of three elements: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; (3) that the delay caused the Defendant undue prejudice. A Court must also consider the public's interest in the trademark. Thus, even though a Defendant might suffer some prejudice, the public interest in avoiding confusion might out weigh that prejudice. Conagra, Inc. v. Singleton, 743 F.2d 1508, 1517 (11 Cir.1984).
40. The mere passage of time does not constitute laches unless the passage of time is shown to have lulled Defendant into actions in reliance thereon. Friend v. H.A. Friend and Co., 416 F.2d 526, 533 (9th Cir.1969); John Walker & Sons, Ltd. v. Bethea, 305 F.Supp. 1302, 1311 (D.C.S.C.1969).
41. Plaintiff allowed Defendant to use its mark conditionally and on a limited basis in 1991-1992 when Defendant was attempting to gain admission to Plaintiff's SEC. Defendant's used Plaintiff's mark on the radio in Florida in 1991-1992. Plaintiff advised Defendant it could no longer *1163 use Plaintiff's mark in 1992 when it denied Defendant's application to join the SEC. Defendant began its newspaper ads in 1994. This case was filed in 1998. The Court finds no inexcusable delay by Plaintiff or undue prejudice to the Defendant.
42. Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of the mark. The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent. Coach House Restaurant v. Coach and Six Restaurants, Inc., 934 F.2d 1551 (11th Cir.1991). The defense requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the Defendant undue prejudice. SunAmerica Corporation v. Sun Life Assurance Company of Canada, 77 F.3d 1325, 1333 (11th Cir.1996). The absence of one element of the acquiescence defense is sufficient to deny the equitable relief requested by the Defendant. Coach House Restaurant v. Coach and Six Restaurants, Inc., 934 F.2d 1551 (11th Cir.1991).
43. The Plaintiff's Southeastern Conference permitted Defendant's use of Plaintiff's mark on the radio in 1991 and 1992 while the Defendant was attempting to gain admission to a Plaintiff's Southeastern Conference. When Plaintiff denied the Defendant's admission into the conference the Defendant knew he no longer had Plaintiff's permission to use Plaintiff's name. The record does not support Defendant's defense of acquiescence.
44. However, even if proved, the defense of acquiescence is not absolute. Upon a showing that "inevitable confusion" arises from the continued dual use of the marks, a senior user's claim may be revived from estoppel. The purpose of such a revival is to vindicate the public interest in avoiding inevitable confusion in the marketplace. The public interest in preventing confusion around the marketplace is paramount to any inequity caused the junior user. SunAmerica, 77 F.3d 1325, 1333.
45. The Court finds from the evidence that Defendant's use of the Plaintiff's mark has and will cause inevitable confusion which can only be effectively avoided by the Court enjoining the Defendant's use of the Plaintiff's mark.
46. Section 1115(b)(4) of the Lanham Act authorizes non-trademark use of a descriptive term only where the term is "used fairly and in good faith." The holder of a protectable descriptive valid mark has no legal claim to an exclusive right in the primary, descriptive meaning of the term; consequently, any one is free to use the term in its primary, descriptive sense "so long as such use does not lead to customer confusion as to the source of the goods or services." Zatarains, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 791 (5th Cir.1983). It is the Defendant's burden to prove that its use is (1) not as a trademark (2) done fairly and in good faith and (3) only to describe to users its goods. Burger King Corporation v. Pilgrim's Pride Corporation, 705 F.Supp. 1522 (S.D.Fla.1988).
47. The fact that the Defendant's use of Plaintiff's mark has lead to actual confusion precludes Defendant from establishing a "fair use" defense.
48. Defendant's use of SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA in its church name(s) and radio and newspaper advertisements is a service and trademark use, because they are each an identifier of source or origin.
49. The very intent in Defendant's adoption of the name SEVENTH-DAY ADVENTIST is to tell the public who the Defendant is, namely, an identifier of source. Furthermore, Defendant's good faith is at issue: its choice of these phrases when other phrases were readily available indicate a clear intent to trade on the good will and product identifier of Plaintiff. Sierra *1164 On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir.1984).
50. Defendant intentionally used "SEVENTH-DAY ADVENTIST" and Plaintiff's acronym "SDA" as an origin-indicating mark and, accordingly, Defendant's fair use defense fails.
51. Defendant cannot claim that it will suffer hardship from an injunction against the use of the mark SEVENTH-DAY ADVENTIST and Plaintiff's acronym SDA as a trademark and service mark where it adopted and expanded the use of these terms with full knowledge of Plaintiff's long-standing use and prior rights.
52. It is well established that religious institutions are entitled to the protection of the trademark and unfair competition laws to the same extent as commercial enterprises and enforcement of the trademark statute does not abridge the religious freedom rights of a religious group that is infringing on a church's trademark or service mark. Purcell v. Summers, 145 F.2d 979 (4 Cir.1944); National Board of YWCA v. YWCA of Charleston, S.C., 335 F.Supp. 615, 617, 624 (D.S.C.1971); Interbank Card Ass'n v. Simms, 431 F.Supp. 131, 133 (M.D.N.C. 1977); Jandron v. Zuendel, 139 F.Supp. 887, 889 (N.D.Ohio 1955). As the Court in National Board YWCAstated:
Nothing in the Constitution prohibits a religious organization from owning property  and a trademark is a property right  or prohibits the government from protecting that property from unlawful appropriation of others. By granting to a religious organization the exclusive use of a name, the Patent Office only deprives other religious groups of the use of that particular name, and such grant does not deny such other religious organizations the opportunity to establish competing groups having the same purpose but with different names. YWCA, at p. 624-25.
The Court finds that enforcement of Plaintiff's trademark rights will not violate any constitutional rights of the Defendants. Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).
IT IS HEREBY ORDERED and ADJUDGED the Defendants and all of their owners, officers, agents, servants, employees, attorneys, their heirs, successors and assigns, and all persons acting in concert or participation with them shall be enjoined from using, the designation "SEVENTH-DAY ADVENTIST," the Spanish equivalent "ADVENTISTA DEL SEPTIMO DIA," and Plaintiff's acronym "SDA" or any other word or words confusingly similar to Plaintiff's mark or infringing Plaintiff's mark or competing unfairly with Plaintiff through the use of any word, symbol or device confusingly similar to Plaintiff's mark or any copy or colorable imitation thereof.
NOTES
[1] The Spanish equivalent of ETERNAL GOSPEL CHURCH OF SEVENTH DAY ADVENTISTS.
[2] The defenses to an incontestable mark are: (1) "obtained fraudulently;" (2) "abandoned;" (3) allow others to use the mark "... so as to misrepresent the source of the goods or services ..."; (4) non-trademark use, "used fairly" and in "good faith""only to describe the goods or services of such party;" (5) lack of knowledge of registrant's prior use; (6) prior use of non registered users marks; (7) used to violate antitrust laws of U.S.; (8) mark is functional; and (9) equitable principles, including laches, estoppel and acquiescence are applicable.
[3] F.S. § 495.151

Every person, association, or union of workers adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and all courts having jurisdiction thereof shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of the confusion as to the source of goods or services.