Timothy C. Batten, Sr., United States District Judge
I. Background
This is a trademark-infringement case in which Plaintiff Reinalt-Tire Corporation ("RTC"), which operates various "Discount Tire" stores, alleges that Defendant Mavis Tire Supply, LLC has infringed its registered "Discount Tire" mark. Mavis operates various stores under the name "Mavis Discount Tire."
RTC was started in 1960 and currently employs over 22,000 people in over one thousand stores in thirty-five states. In 2018, it ranked 95th on Forbes's list of America's Largest Private Companies. RTC operates its Discount Tire stores primarily in the southeast.
Until 2018, Mavis was concentrated in the northeast and did not operate any Mavis Discount Tire stores in the southeast. However, beginning in 2018, Mavis purchased various Kaufman Tire and Sun Tire stores in Georgia and Florida. It converted these stores into Mavis Discount Tire stores. Therefore, according to RTC, Mavis is now infringing its mark in the same geographic market in which RTC operates.
On December 26, 2018, RTC filed this lawsuit, asserting the following counts: (1) federal trademark infringement in violation of Lanham Act § 32; (2) unfair competition in violation of Lanham Act § 43(a); (3) trademark dilution in violation of O.C.G.A. § 10-1-451(b) ; (4) violation of the *1267 Uniform Deceptive Trade Practices Act; (5) unfair competition in violation of O.C.G.A. § 23-2-55 ; and (6) common-law trademark infringement.
Before the Court is RTC's motion [5] for a preliminary injunction, which pertains to its claims for trademark infringement and trademark dilution. RTC seeks to prevent Mavis from using the Mavis Discount Tire mark in Georgia or Florida while this suit is pending.[1]
Following the parties' agreement on a discovery and briefing schedule, the motion is now ripe.
II. Preliminary Injunction Standard
To obtain a preliminary injunction, RTC must demonstrate that (1) its claims have a substantial likelihood of success on the merits; (2) it will suffer irreparable harm in the absence of an injunction; (3) the harm it will suffer in the absence of an injunction would exceed the harm suffered by Mavis if the injunction is issued; and (4) an injunction would not disserve the public interest. Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc. , 299 F.3d 1242, 1246-47 (11th Cir. 2002). The likelihood of success on the merits is generally considered the most important of the four factors. Garcia-Mir v. Meese , 781 F.2d 1450, 1453 (11th Cir. 1986).
The Eleventh Circuit has noted that "trademark actions 'are common venues for the issuance of preliminary injunctions ....' " McDonald's Corp. v. Robertson , 147 F.3d 1301, 1310 (11th Cir. 1998) (quoting Foxworthy v. Custom Tees, Inc. , 879 F. Supp. 1200, 1219 (N.D. Ga. 1995) ).
III. Discussion
The bulk of the Court's analysis turns on the likelihood of success on the merits. However, the Court also analyzes the remaining factors.
A. Likelihood of Success on the Merits-Infringement
RTC brings claims against Mavis for violation of sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a). "Under [section 32 of] the Lanham Act, a defendant is liable for infringement if, without consent, he uses 'in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark' which is 'likely to cause confusion, or to cause mistake, or to deceive.' " Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc. , 91 F. Supp. 3d 1265, 1274 (S.D. Fla. 2015) (quoting 15 U.S.C. § 1114(1)(a) ).
RTC demonstrates that it is likely to succeed on the merits of this claim if it is likely to prove that (1) it possesses valid marks; (2) Mavis "used [those marks] in commerce in connection with the sale or advertising of goods" or services; and (3) Mavis used the marks in a manner likely to confuse consumers. Hoop Culture, Inc. v. GAP Inc. , 648 F. App'x 981, 983 (11th Cir. 2016) ; see also N. Am. Med. Corp. v. Axiom Worldwide, Inc. , 522 F.3d 1211, 1218 (11th Cir. 2008).
Mavis challenges the first and third elements. Specifically, Mavis contends that RTC's "Discount Tire" word mark is not valid because it is either generic or lacks secondary meaning and that, even if the mark is valid, there is no likelihood of confusion.
1. Validity of RTC's Word Mark
The Lanham Act protects only those marks that are sufficiently "distinctive," meaning "capable of distinguishing the owner's goods [or services] from those of others ...." Tana v. Dantanna's , 611 F.3d 767, 773 (11th Cir. 2010).
*1268 The Eleventh Circuit recognizes four categories of distinctiveness:
(1) generic-marks that suggest the basic nature of the product or service; (2) descriptive-marks that identify the characteristic or quality of a product or service; (3) suggestive-marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful-marks that bear no relationship to the product or service, and the strongest category of trademarks.
Id. at 774 (quoting Gift of Learning Found., Inc. v. TGC, Inc. , 329 F.3d 792, 797-98 (11th Cir. 2003) ).
These categories create a distinctiveness spectrum. Inherently distinctive marks like those in categories (3) and (4)-suggestive, arbitrary and fanciful marks-generally receive trademark protection. Id. Conversely, indistinctive marks like those in category (1)-generic marks-generally do not. Id. Marks in category (2)-descriptive marks-form a gray area; they are not inherently distinctive, but they garner trademark protection where they have acquired "secondary meaning." Id. "A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." Id. (quoting Welding Servs., Inc. v. Forman , 509 F.3d 1351, 1358 (11th Cir. 2007) (alteration omitted)).
Neither side argues that "Discount Tire" is suggestive or arbitrary/fanciful. The dispute turns on whether the mark is generic (as Mavis contends) or descriptive (as RTC contends). If the Court concludes that the mark is descriptive, Mavis also contends that RTC has failed to show secondary meaning.
a. Generic or Descriptive
A generic term is one with a primary significance of the class or category of goods or services for which it is used. See 15 U.S.C. § 1064(3). The mark may identify either the product or service's basic nature or the class to which it belongs. Tana , 611 F.3d at 774 ; see also Knights Armament Co. v. Optical Sys. Tech., Inc. , 654 F.3d 1179, 1188 (11th Cir. 2011). Other courts have stated that a generic name depicts the product or service as a whole as opposed to any feature, quality, or characteristic of the product or service. Welding Servs., Inc. , 509 F.3d at 1358. In other words, a generic term explains the identity, not the origin, of the good or service. See Bos. Duck Tours, LP v. Super Duck Tours, LLC , 531 F.3d 1, 14 (1st Cir. 2008).
Therefore, generic terms are considered in the public domain and cannot be appropriated. Sandshaker Lounge & Package Store LLC v. Quietwater Entm't Inc. , 602 F. App'x 784, 787 (11th Cir. 2015). Even if a generic term becomes associated primarily with a single company, it cannot achieve trademark protection. See Welding Servs., Inc. , 509 F.3d at 1358. Thus, if a registered mark is determined to be or have become generic, the registration can be cancelled. Park 'N Fly, Inc. v. Dollar Park & Fly, Inc. , 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Evidence of secondary meaning or likelihood of confusion is irrelevant if a mark is generic. See Bos. Duck Tours, LP , 531 F.3d at 21 (noting that trademark law "is not intended to prevent confusion between two similar, generic marks").
By contrast, a descriptive mark describes not the basic nature or class of a good or service, but a particular characteristic or quality of it. Knights Armament Co. , 654 F.3d at 1188. Such a mark may be registered if it has become distinctive of the applicant's goods or service *1269 in commerce or, in other words, if it has acquired secondary meaning. Two Pesos, Inc. v. Taco Cabana, Inc. , 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).
Because RTC's "Discount Tire" word mark is federally registered,[2] it is entitled to a strong presumption of validity. 15 U.S.C. § 1057(b). Mavis may overcome this presumption by a preponderance of the evidence. Colt Def. LLC v. Bushmaster Firearms, Inc. , 486 F.3d 701, 705 (1st Cir. 2007).
RTC's attempt to register its word mark was initially rejected by the USPTO examiner on the ground that the mark was generic. However, the examiner ultimately approved the mark after RTC submitted (1) declarations regarding public recognition of the mark; (2) a declaration from a linguistics expert that the mark is not generic; and (3) a survey to demonstrate that consumers principally understand "Discount Tire" to be a brand name.[3]
The parties present a variety of evidence regarding whether the mark is descriptive or generic, which the Court examines below.
i. Linguistics
Much of the parties' argument involves linguistics evidence, including that presented to the PTO examiner and additional evidence provided for the purpose of this case. RTC essentially argues that there is no such thing as a "discount tire" but that, instead, it sells tires that are discounted. In other words, RTC argues that "discount" is a descriptive term used to modify "tire" and that the phrase as a whole is descriptive, not generic.
RTC's experts Dr. Ronald Butters and Dr. Robert Leonard have provided opinions, based on their assessment of dictionaries, articles, advertisements, websites, and consumer reviews, that the phrase is not generic. Butters has opined that "discount tire" is a descriptive phrase, with "discount" serving as an adjective to modify "tire." Based on its experts' testimony, RTC argues that "discount tire" is, linguistically, the same as "flat tire" or "rear tire" in that each describes a quality, not a type or category, of tire.
RTC further points to the Consumer Reports tire-buying guide that lists various tire categories, but no category of "discount tires." RTC notes that no publication in evidence has such a category. Further, RTC was awarded "Brand of the Year" in the category of automotive services, not "discount tire" services.[4]
*1270 RTC also points to testimony from Mavis's advertising executive and CEO that Mavis did not refer to a type of tire as a "discount tire" and from Mavis's vice president for Georgia and Florida that he knew of no trade organization or publication that refers to a category of service as "discount tire" or retailer that sold a tire called a "discount tire."
The Court concludes that the linguistics evidence weighs against finding the phrase generic. The argument that there is no category of tire that is a "discount tire" but, instead, that a tire may be discounted (whether temporarily or permanently) appears to have substantial merit. This would lead the Court to conclude that the phrase as a whole describes a characteristic or quality of the product sold, not the identity of the product sold.
ii. Other Use
Mavis places heavy emphasis on historical uses of the phrase "discount tire" by tire dealers and manufacturers in advertisements and articles since at least 1914 (in other words, well before RTC used the phrase).[5] Specifically, the study of its expert Dr. Edward Finegan, Goodyear Tire & Rubber Co. ran an advertisement in 1914 stating that "the same money he would be asked for some discount tire would buy a bigger, better Goodyear." [62-42] at 59. Continuing into the 1920s, Goodyear advertised, "After you have used discount tires buy GOODYEARS for Quality and Service." Id. at 70.
The United States Rubber Company ran advertisements in 1921 asking, "Why ... are they offered such hodge-podge stocks of 'discount tires,' 'odd lots,' 'seconds,' 'retreads' and other so-called bargains of uncertain origin?" Id. at 77. Other examples include various references to a "DISCOUNT TIRE SALE" by multiple companies. Id. at 99-101.
Mavis also points to various tire retailers who have used the phrase "discount tire" to describe their goods and services. For instance, a California store referred to itself (in 1959) as the "World's Largest Discount Tire Dealer," and an Arizona store referred to itself (in 1960) as "Arizona's Largest Independent Discount Tire and Seat Cover Distributor." Id. at 103-09.
RTC responds, based on Dr. Leonard's analysis, that these advertisements (the number of which, it contends, is small in comparison to the amount of material Finegan reviewed) use the phrase descriptively (in other words, as a characteristic or feature of a tire, not the name of a particular item). Further, it argues, isolated examples should not be determinative of genericness.
Mavis also argues that third-party retailers have used the phrase "Discount Tire" in their names for years. It points to various sources, one identifying 283 businesses in thirty-nine states and another pointing to 292 businesses in forty-two states. These include Devonshire Discount Tire, Auto Body & Repair Center in New York (operating for sixty years) and Bear Alignment Discount Tire in Pennsylvania (since 1935). At least fifty-two of them are in Georgia or Florida, including Johnny Myers Discount Tires and Auto Repair, which has operated in Fort Myers, Florida *1271 for forty-three years. Mavis argues that this evidence of unaffiliated businesses incorporating the phrase in their names supports genericness. See Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC , 702 F.3d 1312, 1318 (11th Cir. 2012).
The Court concludes that that this evidence is not determinative. Specifically, for the same reasons the Court concluded that the linguistics evidence weighs in favor of finding the term descriptive, it concludes that many of the uses appear to be in a descriptive context. See also Gift of Learning Found., Inc. , 329 F.3d at 798 (noting that the extent to which third parties use a mark is evidence of descriptiveness rather than genericness). RTC obviously concedes descriptiveness; indeed, its argument is just that.
Mavis also argues that RTC's own use of the term supports a finding that it is generic. Specifically, Mavis points to RTC's statement that the name is "a promise for low [tire] prices" and that its stores are discount tire stores. [63-1] at 18. It also points to RTC's branding expert, Erich Joachimsthaler, who testifies that the founder believed the name told customers they could get a good deal at his store. RTC's executive vice-president Dean Muglia stated that he originally asked what was "the name of this company that sells discount tires" only to be told, "No, Discount Tire Company is the company name." Id. at 37. Muglia has stated that the words inform customers that they can get a competitive price on tires.
Importantly, however, these examples are not customer-facing. Even so, "a small number of casual, isolated generic name references by the trademark owner will usually not be enough to prove that the term has become a generic name to the public." MCCARTHY , supra at 1269 n.2, § 12:13.
Ultimately, although the Court concludes that the evidence regarding third-party usage supports Mavis's position, it is not dispositive.
iii. Survey Evidence
Much of the parties' argument focuses on their competing survey experts and these experts' reports.
RTC's expert is Matthew Ezell. His report attaches a survey conducted in 2013 by the late Gerald Ford, who founded the firm for which Ezell works. Ford conducted the 2013 survey (across more than thirty-five U.S. markets, including Georgia and Florida) in support of RTC's federal trademark application. Ford's survey concluded that 80% of relevant consumers recognize Discount Tire as a brand name. Based on this, he concluded that the principal significance of "discount tire" was as a brand name or trademark, rather than a generic term or designation, and that the mark was strong and famous among potential tire purchasers.
Ezell ran a similar survey in 2019, resulting in a finding that between 76% and 84% of consumers recognize Discount Tire as a brand name for retail tire services.
Ezell and Ford conducted their consumer surveys under the "Teflon " research design model employed in E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc. , 393 F. Supp. 502 (E.D.N.Y. 1975). In Teflon studies, researchers ask respondents to categorize terms as either brand names used by a single company or common names used by multiple companies.[6]
Mavis contends that the Teflon format is inappropriate in this context, where the term studied did not begin as a coined term but, rather, as a common word or *1272 phrase. "[W]here, as here, one party claims to have exclusive rights in a term that was not previously controlled by that party as a coined term, courts have found that Teflon surveys are ineffective at determining the true weight of public perception." Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC , 124 U.S.P.Q.2d 1184, 1202 (T.T.A.B. 2017) (emphasis added) (footnote omitted). This, Mavis contends, is because Teflon surveys do not account for multiple businesses using the term in their brand names, and thereby provide the possibility of false positives, in which a consumer may recognize that "Discount Tire" is a brand name but associate the name with a different business also including the phrase in its name.
Although the Teflon survey did originate in the context of a party attempting to show that a coined term had become generic over time, RTC responds by pointing out that numerous courts (including some in this circuit) have relied on Teflon surveys in cases regarding non-coined terms. See, e.g. , Booking.com B.V. v. USPTO , 915 F.3d 171, 183-84 (4th Cir. 2019) ; Burger King Corp. v. Pilgrim's Pride Corp. , 705 F. Supp. 1522, 1526 (S.D. Fla. 1988).
RTC argues that Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc. , 240 F.3d 251 (4th Cir. 2001), on which Mavis relies, rejects the relevance of all survey evidence in non-coined terms, not just Teflon surveys. McCarthy has opined that the view that consumer perception is irrelevant for a non-coined term "is to assume the result before making an analysis of that which is to be decided." MCCARTHY , supra at 1269 n.2, § 12:17.50.
Mavis's survey expert is Yoram (Jerry) Wind, Lauder Professor Emeritus and Professor of Marketing at the Wharton School, and a member of the Marketing Hall of Fame. Wind designed his own study of past and future tire buyers both nationwide and throughout Georgia and Florida.[7] This study allowed participants to choose one or more of the following responses regarding the phrase "discount tire": (1) used by only one company; (2) used by more than one company as part of the company's name or as a product name; and (3) used by more than one company generally to refer to a type of business. The results demonstrated that only roughly 23% of participants associated the phrase "Discount Tire" with a single company.[8]
RTC critiques Wind's survey methodology as inappropriately novel and flawed. It points to Ezell's testimony that Wind's survey design is "confusing, biased, and fails to reliably measure the primary significance" of the term. [67] at 8.
RTC further contends that Wind improperly combines the genericness inquiry (which, it states, should be a dichotomous choice between brand or common name) with secondary-meaning questions (whether consumers associate the term with one company or multiple companies). This leads, according to RTC, to descriptive terms that are used by multiple companies being improperly characterized as generic.
The Court finds that a Teflon survey is not inherently inappropriate in this context. Wind's survey indeed appears to be directed largely toward secondary meaning rather than whether the mark at issue is generic or descriptive.
*1273 Mavis also contends that RTC's surveys are flawed because they are limited to areas in which RTC stores are located. Specifically, Ford's survey was conducted in thirty-seven markets in the continental United States with three or more Discount Tire stores within a three-mile radius. Ezell's survey was conducted in Atlanta, Jacksonville, and Orlando metropolitan areas, all of which have seven or more Discount Tire stores within a twenty-five-mile radius.
This, according to Mavis, inappropriately biases RTC's surveys. Mavis points out that RTC asked Google to perform a survey in 2015, and the results of that survey showed that 40% of nationwide respondents had not heard of Discount Tire. Further, Wind has concluded that Ford's and Ezell's conclusions cannot be extrapolated nationwide or even throughout Georgia or Florida.
However, Ezell has testified that such a survey must be performed in markets in which consumers would have had the opportunity to be exposed to the plaintiff's use of the term at issue. Further, RTC contends, because Ezell's survey was conducted in connection with the preliminary injunction motion, it was appropriate to conduct it in cities where the alleged confusion is occurring. It argues that Mavis has not provided any data to suggest that consumers in other parts of Georgia and Florida view the terms differently.[9]
Ultimately, the survey evidence conflicts. The parties dispute which type of survey is appropriate and point to purported flaws in each other's surveys. However, the Court finds that the survey evidence as a whole favors RTC. Courts have considered Teflon surveys to be appropriate in the context of a non-coined term such as that at issue here. By contrast, Mavis has provided no authority that the entirety of its survey should be used for the generic-versus-descriptive inquiry (as opposed to secondary meaning). Further, the Court sees no reason why a survey conducted in the relevant market for the preliminary injunction is inappropriate.
iv. Conclusion: Descriptive
Ultimately, the Court is faced with conflicting evidence regarding whether the phrase "discount tire" is generic or descriptive. The Court finds particularly persuasive that "discount" is used as an adjective to describe "tire" but that there is no such thing as a permanent "discount tire." Rather, a tire may be discounted for a period, or even for its life-span, but there is not a particular "discount tire."
Regarding the survey evidence, the Court finds Ford's and Ezell's surveys persuasive. Although courts have disagreed on whether a Teflon survey is appropriate in the context of a non-coined term, the Court finds that it, in combination with the other evidence, supports a finding that the mark is likely not generic. Although Mavis argues that the surveys were inappropriately limited in geographic scope, it has not provided the results of a nationwide Teflon survey to combat Ford's and Ezell's results. Further, although Wind's survey produced results that would support a finding of genericness, the Court is not persuaded that his survey is directed entirely to the generic versus descriptive inquiry. As RTC points out, Wind's survey pertains to whether a customer associated the "discount tire" phrase with one or more companies. This inquiry meanders into the secondary-meaning inquiry, which the Court will address next. However, for *1274 purposes of determining whether the mark is generic, the Wind survey does not sufficiently rebut the findings of the Ford and Ezell survey findings that the mark is heavily associated in the mind of customers with a business, as opposed to a common noun.
Although Mavis points to other businesses and entities that have used "discount tire" to refer to goods and services, the Court does not find this usage dispositive. Some uses appear to be more descriptive than generic, for instance, advertisements that appear to use "discount" as a modifier for "tire" rather than advertising an item known as a "discount tire." Some usage (other businesses, etc.) weighs slightly against finding the term to be descriptive. However, given the minimal instances to which Mavis points, the Court is not persuaded that this usage overcomes the evidence that weighs in favor of concluding that the term is descriptive.
The Court also notes that its conclusion is based in part on the fact that RTC has a registered word mark, so Mavis bears the burden of demonstrating that the mark is not valid by a preponderance of the evidence. The Court concludes that it has failed to carry that burden. The outcome might be different if no registration existed and the burden were solely RTC's, but the Court holds at this stage that RTC is likely to prevail in demonstrating that its mark is descriptive, not generic.
b. Secondary Meaning
Having concluded that RTC has demonstrated that it is likely to show its mark to be descriptive rather than generic, the Court now turns to the question of whether the mark, assumed to be descriptive, has acquired secondary meaning.
RTC contends that its mark has developed secondary meaning based on its "longstanding exclusive use in the Southeast, in combination with substantial advertising and sales ...." [5-1] at 20. See, e.g. , St. Luke's Cataract & Laser Inst., P.A. v. Sanderson , 573 F.3d 1186, 1209 (11th Cir. 2009). RTC also points to various awards its brand has received, such as Discount Tire receiving Harris Poll/EquiTrend's "Brand of the Year" in the "Automotive Service Center" category for five consecutive years (2013 through 2017).
In addition, Dr. Butters performed a study of Yelp reviews of tire dealers. According to this study, although the 435 reviewers mentioning "snow tires" and 230 reviewers mentioning "all-season" tires treated those terms as generic, the preponderance of usage of the term "discount tire" by consumers was as a compound proper noun to refer to RTC's business. In one database (in fact, the largest database) that Dr. Butters reviewed, between 97 and 98% of the usage of the phrase "discount tire" was as a trademark. Yelp and Atlanta tire-store customer reviews of RTC also, per Dr. Butters, demonstrated that the primary significance was as a trademark.[10]
RTC has, over the past fifty-eight years, spent over one billion dollars promoting its marks, and has a television commercial still running that originally aired in 1975 (that was named "The World's Best Broadcasting Advertisement" by the Hollywood Radio and Television Society in 1976 and *1275 set a Guinness World Record for the longest-running television commercial in 2004).
RTC promotes its "discount tire" mark in various ways, including the internet, on a Nascar car, and in its retail stores. It provided evidence to the PTO in 2014 of secondary meaning based on evidence of billions of dollars of sales and over $1 billion in advertising. Since that time, it asserts, its sales have nearly doubled and its advertising spending has increased.
Based on the evidence, the Court finds that RTC is likely to succeed on the merits of its argument that it has demonstrated secondary meaning. Specifically, RTC is particularly likely to prevail because Mavis has not met its burden to show by a preponderance of the evidence that RTC's mark is not valid for lack of secondary meaning. Although the Court has considered Dr. Wind's survey report in the context of secondary meaning (where it seems more appropriate), this does not meet Mavis's burden.
Therefore, the Court will proceed to analyze likelihood of confusion.
2. Likelihood of Confusion
Courts in this circuit look to the following non-exclusive list of factors when determining whether a defendant's use of disputed marks is likely to cause consumer confusion:
(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods, i.e. , retail outlets or customers; (5) the similarity of advertising methods; (6) the defendant's intent, e.g. , does the defendant hope to gain competitive advantage by associating his product with plaintiff's established mark; and (7) [most persuasively,] proof of actual confusion.
Conagra, Inc. v. Singleton , 743 F.2d 1508, 1514 (11th Cir. 1984).
a. Strength of Mark
There are four recognized categories of marks:
Generic marks are the weakest and not entitled to protection-they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold). "Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive." For instance, "penguin" would be suggestive of refrigerators. An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services). Arbitrary marks are the strongest of the four categories.
Frehling Enters., Inc. v. Int'l Select Grp., Inc. , 192 F.3d 1330, 1335-36 (11th Cir. 1999) (citations and punctuation omitted) (quoting Dieter v. B & H Indus. of S.W. Fla., Inc. , 880 F.2d 322, 327 (11th Cir. 1989) ).
The strength and validity of a mark is "determined by viewing the trademark as a whole," including any generic, descriptive, or disclaimed portions. Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc. , 106 F.3d 355, 362-63 (11th Cir. 1997) ; accord Country Floors, Inc. v. P'ship Composed of Gepner & Ford , 930 F.2d 1056, 1065 (3d Cir. 1991) ("The descriptive portions of a mark can be disclaimed, although the entire composite mark, including the descriptive terms, *1276 is considered for purposes of infringement.").
"Also important in gauging the strength of a mark is the degree to which third parties make use of the mark." Frehling Enters. , 192 F.3d at 1336. "Where there is a lack of third-party use, the mark's strength is enhanced, as it is more distinctive, and therefore more easily recognized by consumers." Id.
RTC contends that its mark is descriptive with secondary meaning, rendering it conceptually strong. See Tana , 611 F.3d at 776. It also argues that its sales and advertising spending, combined with the survey results showing its mark to be strong and famous, renders the mark commercially strong.
Mavis responds that the phrase is conceptually weak and that RTC's evidence does not demonstrate consumer understanding of its name.
Although the Court has concluded that RTC is likely to succeed on the merits regarding the validity of its mark, it does not find that the mark is particularly strong. The phrase has been used by several others both before and after RTC's existence and, as the Court noted above, the conclusion regarding validity may have been different if RTC's mark had not been registered. This factor weighs against finding a likelihood of confusion.
b. Similarity of Marks
"[T]he closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents." Frehling Enters., Inc. , 192 F.3d at 1337.
RTC argues that the marks are sufficiently similar to cause confusion (and points to the evidence of actual confusion discussed below). It argues that simply adding "Mavis" in front of its mark is equivalent to "Mavis Starbucks" or "Mavis Kentucky Fried Chicken" and should not be permitted. See Ky. Fried Chicken Corp. v. Smith , 351 F. Supp. 1311, 1312-13 (E.D. Mich. 1972) ; see also Select Auto Imps., Inc. v. Yates Select Auto Sales, LLC , 195 F. Supp. 3d 818, 836 (E.D. Va. 2016) (stating that the "addition of a house mark can aggravate, rather than mitigate confusion"). RTC also argues that internet searches (particularly searches that are quick and superficial, as many are) may reduce the significance of extra words such as "Mavis" because search engines will return results for both parties' companies.
Mavis, focusing on the full logos, argues that the marks use different color schemes and design formats. Even regarding the word mark, it states that it uses "discount tire" only with its name and house mark. The only overlap, it argues, is "the weak common term 'discount tire,' " and the number of other businesses incorporating the phrase into their names weighs against finding similarity. [63-1] at 49.
The Court concludes that the marks are similar. The relevant inquiry involves the word marks, not the full design marks with colors, etc. The only difference is the inclusion of the name "Mavis" in front of the phrase "Discount Tire." As RTC points out, adding this does little to alleviate the possibility of confusion. This factor therefore weighs in favor of finding a likelihood of confusion.
c. Similarity of Products or Services
The third factor relevant to the likelihood-of-confusion analysis "requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." Frehling Enters., Inc. , 192 F.3d at 1338. In other words, the operative inquiry is "whether the goods are so related in the *1277 minds of consumers that they get the sense that a single producer is likely to put out both goods." ITT Corp. v. Xylem Grp., LLC , 963 F. Supp. 2d 1309, 1321 (N.D. Ga. 2013).
RTC asserts that both parties target the same consumers and are located within close proximity to each other, sometimes even across the street. Mavis has not argued that the products and services sold are not similar. The Court concludes that this factor weighs in favor of finding a likelihood of confusion.
d. Similarity of Sales Methods
"This factor takes into consideration where, how, and to whom the parties' products are sold. Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion, though evidence that the products are sold in the same stores is certainly strong." Frehling Enters., Inc. , 192 F.3d at 1339 (citations omitted). Rather, to support a likelihood of confusion, there should be "some ... overlap" between the parties' respective retail outlets and customer bases. Id.
The parties sell in similar stores to similar customers. Further, RTC points out that many consumers (over 80%) begin shopping for tires online, becoming confused before entering a physical store. Mavis has not argued that the sales methods are not similar. The Court finds that this factor weighs in favor of finding a likelihood of confusion.
e. Similarity of Advertising Methods
In comparing the similarity of the parties' advertising methods and media, "[i]dentity of periodicals is not required; the standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." Id. at 1340.
RTC argues that both parties use the same media channels, including print, television, and radio. Specifically, it points out that there is a "significant temporal separation between the [radio] ad's 'Mavis' and 'Discount Tire' references." [53] at 11. Mavis has not argued that the parties' advertising methods are not similar. The Court finds that this factor weighs in favor of finding a likelihood of confusion.
f. Defendant's Intent
"If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." Frehling Enters., Inc. , 192 F.3d at 1340. Improper intent can be manifested through either "conscious intent to capitalize on [the plaintiff's] business reputation" or "intentional[ ] blind[ness]" by the defendant in adopting the allegedly infringing marks. Id.
Mavis points out that David Sorbaro independently selected and designed the Mavis marks roughly thirty years ago and that there is no evidence that it copied RTC's marks or intended to confuse consumers regarding association. RTC has not argued otherwise. The Court concludes that this factor weighs against finding a likelihood of confusion.
g. Actual Confusion
"It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion. However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case." Id. (citation omitted). Courts have considered as few as two instances of actual confusion to support a finding of likelihood of confusion. See *1278 Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc. , 675 F.2d 1160, 1167 (11th Cir. 1982), abrogated by Tobinick v. Novella , 884 F.3d 1110 (11th Cir. 2018).
RTC points to numerous instances of consumers who believed an association existed between the parties, visited one party's store believing they were at the other's location, attempted to schedule service with the wrong party, or came to the wrong party's location for an interview. RTC has submitted declarations of over ninety instances of actual confusion. This includes over fifteen sworn customer declarations. In addition, Mavis itself identified thirty instances of confusion in the two-month limited discovery period (including nine customers who made appointments with RTC but came to Mavis's store and eleven who asked if the stores were related).
Some of the instances of confusion to which RTC points include the following:
• An RTC customer called Mavis to make a service appointment because she thought "Mavis Discount Tire and Discount Tire were the same company and ... Mavis Discount Tire was just another branch of Discount Tire." [5-31] at 43.
• Another customer thought "Discount Tire and Mavis Discount Tire were affiliated because [he] had seen a Mavis Discount Tire commercial and noticed that the style of the lettering ... and the name itself were similar to that of Discount Tire." Id. at 55.
• Upon hearing a radio advertisement featuring the words "Mavis Discount Tire," a long-time RTC customer thought that "Mavis had ... taken over Discount Tire." Id. at 45.
• Another RTC customer called Mavis to schedule a service "because the name was so similar to Discount Tire." Id. at 13.
• Having visited Mavis's website, a customer asked if RTC's store was open on Sundays.
• After making an appointment on Mavis's website, a customer went to RTC's store for the service, believing her appointment was with RTC.
• A customer went to RTC's store to complain about a recent tire installation and presented a Mavis receipt.
• Another consumer looking to buy tires "called the Discount Tire store number in the belief that [he] was calling the Mavis Discount Tire store." Id. at 51.
• An individual called RTC to complain about the service he had received from Mavis.
• A customer mistakenly went to RTC's store for a tire patch, thinking RTC and Mavis were the same company "because of the 'discount tire' name." Id. at 17.
• A customer went to Mavis for her Discount Tire appointment, and when told that she was at Mavis and not Discount Tire, she asked, "isn't that the same thing?" [53-14] at 5.
• A customer made an appointment with Mavis thinking it was Discount Tire "owned or run by someone named Mavis." Id. at 9.
• A customer called Mavis to inquire about tire prices, thinking he was calling Discount Tire.
• A customer went to Discount Tire for tire installation, but the order confirmation she provided was from Mavis.
• A customer asked if Mavis was the parent company of Discount Tire.
• A customer stood in line at Mavis for her Discount Tire appointment under *1279 the impression that she was at Discount Tire.
• At one or more stores in Jacksonville, Mavis answers its phone, "Thank you for choosing Discount Tire." Id. at 64.
• A job applicant who was hired by Mavis went to Discount Tire for paperwork, assuming that the two were the same company.
• Tire Hub delivered six tires and TCI delivered four tires for Mavis to RTC's store.
• NAPA Auto Parts delivered Mavis's brake calipers to RTC's store.
• Another vendor delivered RTC's three orders to Mavis's store.
• One of Mavis's job applicants came to RTC's store to apply for an opening with Mavis.
• A Mavis job applicant called RTC's store to check on his application.
• Various Mavis employees have called RTC believing they were calling Mavis.
Mavis was permitted to depose six of RTC's affiants. Of those, it points to purported flaws in each of the affiants' confusion. Specifically,
• Matthew Blythers testified that asking whether RTC was affiliated with Mavis was to "just mak[e] conversation." He was aware that there possibly were two different companies. [54-5] at 26.
• John Fortener searched Google for Mavis Discount Tire. He clicked on the RTC telephone link, assuming Mavis would be the first result. However, he has stated that he knew the two were separate stores.
• Lisette Johnson booked an appointment with a Kauffman Tire store (before it was rebranded as a Mavis Discount Tire store) after conducting an internet search for the term "discount tire." She does not believe that a relationship exists between the two companies.
• Kayla Jones was not familiar with RTC. She mistakenly made an appointment with Mavis, but her boss corrected her and she changed the appointment to RTC.
• Kathryn Lovins understands that the companies are separate; an operator gave her the wrong number to call.
• Wayne Morgan accidentally called Mavis after the name came up on the phone. However, he understands the companies to be separate.
Although Mavis did flesh out additional detail in deposing the witnesses, the Court is not persuaded that the depositions eliminate the actual confusion. For instance, the fact that Kayla Jones was not familiar with the companies and her boss corrected her mistake does not change the fact that a person attempting to make an appointment was confused about the companies.
Even so, Mavis contends that these instances do not suffice because (1) RTC has not provided evidence that a consumer erroneously purchased a tire from one party believing it was purchasing from the other; and (2) RTC's instances of confusion involve "at most, momentary mistakes caused by mere attentiveness or a lack of familiarity with either business." [63-1] at 41-42.
The Eleventh Circuit has held that "[s]hort-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, while confusion of actual customers of a business is worthy of substantial weight." Safeway , 675 F.2d at 1167 (citation omitted). Courts have considered evidence of belief of affiliation in determining whether actual confusion *1280 exists. See Ewe Grp., Inc. v. Bread Store, LLC , 54 F. Supp. 3d 1343, 1351 (N.D. Ga. 2014). A mistaken purchase is not required. See Foxworthy , 879 F. Supp. at 1216.
Although RTC has not shown that a customer actually bought something from Mavis believing they were buying from RTC (or vice versa), it has shown numerous examples of customers who believed the companies were affiliated or mistook one company's store for the other's. The Court finds that this factor weighs heavily in favor of finding a likelihood of confusion.
Having considered the factors, the Court finds that RTC has demonstrated that it is likely to succeed in showing a likelihood of confusion between its mark and the "Mavis Discount Tire" name.
3. Laches
Mavis also argues that RTC's claims are barred by laches. To demonstrate that its laches defense applies, Mavis must show that (1) RTC delayed in asserting a right or claim; (2) the delay was not excusable; and (3) the delay caused Mavis undue prejudice. Groucho's Franchise Sys., LLC v. Grouchy's Deli, Inc. , 683 F. App'x 826, 829 (11th Cir. 2017).
Mavis points to RTC's February 6, 2009 cease-and-desist letter accusing Mavis of trademark infringement. At the time, states Mavis, the parties already were competing for online sales. Mavis responded that it intended to continue using "discount tire" but proposed a settlement and stated it would assume RTC decided not to pursue its claims if RTC did not respond to its letter. RTC did not respond.
Mavis contends that RTC's delay is inexcusable. The Eleventh Circuit measures delay from the time at which a plaintiff knows or should know it has a provable infringement claim. Id. at 830. Mavis states that the 2009 letter accused it of existing, not potential, trademark infringement.
RTC argues that it could not have sued before 2018 because the parties were not previously in the same territory, which is a prerequisite to injunctive relief. See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist. , 889 F.2d 1018, 1027-28 (11th Cir. 1989). Further, it contends that Mavis had materially altered its infringing activities by expanding into territory where RTC was present. It also states that it notified Mavis immediately when it learned of Mavis's expansion plans.
The Court finds that, to the extent RTC's timing constitutes a delay, it is an excusable delay because it was the result of the fact that, before Mavis's expansion, the parties were not operating in the same territory. RTC seeks an injunction for Mavis's usage in its Georgia and Florida stores, not its online usage. Therefore, the Court concludes that Mavis's expansion into Georgia and Florida market altered its alleged infringement such that RTC's timing in bringing suit was not unreasonable.
4. Conclusion as to RTC's Likelihood of Success
In sum, the Court holds that RTC has demonstrated a likelihood of success on the merits of its claim for trademark infringement.
B. Likelihood of Success-Dilution
Every person, association, or union of working men adopting and using a trademark ... may proceed by action; and all courts having jurisdiction thereof shall grant injunctions to enjoin subsequent use by another of the same or any similar trademark ... if there exists a likelihood of injury to business reputation *1281 or of dilution of the distinctive quality of the trademark ... of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services ....
O.C.G.A. § 10-1-451(b). Such a mark need not be "famous" or registered; rather, it is protectable if it is distinctive (either inherently or through secondary meaning). See Corbitt Mfg. Co. v. GSO Am., Inc. , 197 F. Supp. 2d 1368, 1379 (S.D. Ga. 2002).
Dilution "occurs 'where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark.' " Amstar Corp. v. Domino's Pizza, Inc. , 615 F.2d 252, 265 (5th Cir. 1980) (quoting Holiday Inns, Inc. v. Holiday Out in Am. , 481 F.2d 445, 450 (5th Cir. 1973) ).
RTC argues that Mavis is likely to dilute the distinctive quality of RTC's mark, of which RTC has long had exclusivity in the Georgia market. Based on the evidence discussed in the context of infringement, the Court concludes that RTC is also likely to succeed on the merits of its dilution claim.
C. Irreparable Harm
Irreparable harm has previously been found to exist based on a substantial threat of customer confusion and the resulting harm to the plaintiff's reputation and goodwill. See, e.g. , Ferrellgas Partners, LP v. Barrow , 143 F. App'x 180, 190 (11th Cir. 2005) ; Sound Surgical Techs., LLC v. Leonard A. Rubinstein, M.D., P.A. , 734 F. Supp. 2d 1262, 1278 (M.D. Fla. 2010).
RTC points to its branding expert Dr. Erich Joachimsthaler's testimony that Mavis's use of the "Mavis Discount Tire" mark will irreparably harm (1) consumer awareness and exclusive association of the brand Discount Tire with RTC; (2) positive brand associations between RTC and Discount Tire; (3) perceptions of quality regarding Discount Tire; (4) consumer and customer loyalty; and (5) relationships with manufacturers and distributors.[11]
Even in the absence of a showing that Mavis's use of the Discount Tire mark is causing RTC to lose business, RTC contends that it is suffering irreparable harm in the form of loss of control of its reputation and goodwill. RTC contends that harm will occur because the two brands have different associations. Mavis's expert Dr. Joel Steckel has opined that if the mark is valid and there is a likelihood of confusion, a disruption of the brand association networks possibly would be harmful and that it would be difficult to calculate the financial injury of rendering the mark generic.
Mavis argues that the delay precludes relief. A delay, though not inherently fatal, can weigh against finding irreparable harm. Wreal, LLC v. Amazon.com, Inc. , 840 F.3d 1244, 1248 (11th Cir. 2016). Mavis points to the fact that RTC also has ignored other businesses in Georgia and Florida that use the phrase "discount tire" in their names.
The Court concludes that any purported delay by RTC does not defeat a finding of irreparable injury. See generally Ga. Television Co. v. TV News Clips of Atlanta, Inc. , 718 F. Supp. 939, 949 (N.D. Ga. 1989) (finding irreparable harm despite two-year *1282 delay by the plaintiff, noting that there was no evidence that such delay had prejudiced the defendant).
Here, as discussed in more detail above in the context of Mavis's laches argument, the purported delay resulted from the fact that Mavis originally used the Mavis Discount Tire mark in a market that did not overlap with RTC's. Once the markets began to overlap, RTC promptly filed this action and the motion for a preliminary injunction.
C. Balance of the Equities
Mavis argues that an injunction "would strip [it] of its ability to use its decades-old name to identify its stores in Georgia and Florida, thus inhibiting Mavis's ability to communicate the nature of its business to consumers, jeopardizing the goodwill built up with customers, and wasting the millions expended on rebranding and advertising, not to mention the millions more it would cost to rebrand yet again if Mavis ultimately prevails." [63-1] at 49-50.
RTC contends that Mavis may continue to do business in its Georgia and Florida stores under its prior marks, but allowing it to use the "Mavis Discount Tire" name while this suit is pending would cause significant damage to RTC.
In light of RTC's likelihood of success on the merits and demonstration that irreparable harm is likely, the Court concludes that the balance of the equities favors granting injunctive relief.
D. Public Interest
Mavis argues that the primary public-interest factor here is the potential effect on competition, both for Mavis and other retailers in Georgia and Florida that use "discount tire" to identify their businesses.
RTC responds that the public interest is served by preventing confusion in the marketplace and guaranteeing consumers the product they desire. See Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc. , 244 F. Supp. 3d 1368, 1384 (N.D. Ga. 2017) ; Schmidt v. Honeysweet Hams, Inc. , 656 F. Supp. 92, 97 (N.D. Ga. 1986).
The Court agrees with RTC. The public interest is served by protecting valid trademarks from infringement or dilution and preventing confusion in the marketplace.
RTC's motion for a preliminary injunction will be granted.
As the parties undoubtedly are aware, a preliminary injunction requires the moving party to post a security bond. FED. R. CIV. P. 65(c). RTC has indicated in its briefing that it is prepared to post a bond. However, the parties have not discussed in briefing what amount of bond would suffice. Because the Court requires more information to adequately set bond, it will provisionally set bond at a nominal amount of $5000, to be potentially revised if either party files an objection to that amount. See Builder's World, Inc. v. Marvin Lumber & Cedar, Inc. , 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007). If neither party files an objection within seven days, the Court will deem any objections to be waived. RTC will then have to post a bond of $5000.
IV. Conclusion
For the foregoing reasons, RTC's motion [5] for a preliminary injunction is granted. Mavis is ordered not to use the "Mavis Discount Tire" mark in Georgia or Florida until further order of this Court.
This Order is stayed until RTC has posted bond. Once it has posted nominal bond of $5000 (if no objections are filed) or the Court has ruled on any objections to the *1283 $5000 bond amount, the stay will terminate and Mavis will comply with this Order within fourteen days of the termination of the stay.
Mavis's motion [70] to strike is denied as moot.
IT IS SO ORDERED this 10th day of July, 2019.

RTC does not seek similar relief regarding Mavis's northeastern stores.

RTC also has two registrations for marks that include design elements. Because RTC seeks to stop Mavis from using the very phrase "Discount Tire" in its name, those design marks are not relevant for the Court's purposes in ruling on RTC's motion for a preliminary injunction. Mavis argues that the fact that RTC disclaimed in those applications the exclusive right to use the words "Discount Tire" apart from the mark as shown in the relevant designs supports the conclusion that the words alone are generic. However, disclaimers concede only descriptiveness, not genericness. Thomas McCarthy, McCarthy's on Trademarks and Unfair Competition § 19:65 (5th ed. 2019).

Mavis attempted to register its "Mavis Discount Tire" marks, but RTC filed opposition actions, and Mavis has not successfully registered its marks.

The parties' experts dispute whether the fact that "discount tire" does not appear as an entry in a dictionary weighs against genericness. RTC contends that it does, and points out that dictionaries include entries for various compound nouns using "discount" or "tire" as one word of the phrase. Mavis argues that each of the two terms is in the dictionary and anyone can determine the meaning of the combination. See E. Air Lines, Inc. v. N.Y. Air Lines, Inc. , 559 F. Supp. 1270, 1275 (S.D.N.Y. 1983) (finding the combination of "air" and "shuttle" generic). Mavis contends that the phrase "discount tire" is simply referring to the nature of the parties' respective businesses. The Court does not find either argument dispositive.

To the extent RTC argues that this is unimportant because those uses describe a product, not a store selling a product, the Court agrees with Mavis that a generic term for a good or service is also a generic term for a business that provides that good or service. See Welding Servs., Inc. , 509 F.3d at 1359.

Ford clarifies that he accepted responses that a term may belong in both categories, but he did not affirmatively instruct respondents that they could provide a "both" response.

The study for "Lucky Charms" produced nearly identical results to a Teflon study for the same term.

Roughly 90% of consumers associated "Pep Boys" and "Jiffy Lube" with a single company; over 40% associated "raisin bran" with a single company.

RTC also notes that Wind conducted a nationwide Teflon study but Mavis refused to produce the survey results.

RTC's expert Dr. Donna Hoffman performed an analysis of Google-related search results and concluded that Georgians and Floridians who search for "discount tire" most likely intend (as Google's algorithm predicts) to search for RTC's brand. Mavis argues that RTC's reliance on Google searches fails because its methodology is nothing more than Hoffman's speculation. However, because the Court concludes that RTC has met its burden regarding descriptiveness without Dr. Hoffman's testimony, it need not reach the merits of Mavis's objections.

Dr. Joachimsthaler's report relies in part on EquiTrend. After Mavis's expert Dr. Joel Steckel expressed concerns with such reliance, RTC provided a supplemental report by Dr. Joachimsthaler. Mavis moved [70] to strike this supplemental report. Because the Court does not rely on the supplemental report, Mavis's motion [70] to strike will be denied as moot.